USCA1 Opinion

 

 October 11, 1996 UNITED STATES COURT OF APPEALS October 11, 1996 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 95-1614 UNITED STATES OF AMERICA, Appellee, v. JOHN HOULIHAN, Defendant, Appellant. _________________________ No. 95-1615 UNITED STATES OF AMERICA, Appellee, v. JOSEPH A. NARDONE Defendant, Appellant. _________________________ No. 95-1675 UNITED STATES OF AMERICA, Appellee, v. MICHAEL D. FITZGERALD Defendant, Appellant. _________________________ ERRATA SHEET ERRATA SHEET The opinion of this court issued on August 22, 1996, is corrected as follows: On page 52, line 22, change "Boylan" to "O'Bryant" ______ ________ UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 95-1614 UNITED STATES OF AMERICA, Appellee, v. JOHN HOULIHAN, Defendant, Appellant. _________________________ No. 95-1615 UNITED STATES OF AMERICA, Appellee, v. JOSEPH A. NARDONE Defendant, Appellant. _________________________ No. 95-1675 UNITED STATES OF AMERICA, Appellee, v. MICHAEL D. FITZGERALD Defendant, Appellant. _________________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ _________________________ Before Selya, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ _________________________ Charles W. Rankin, with whom Rankin & Sultan was on brief, _________________ _______________ for appellant Houlihan. Jonathan Shapiro, with whom Angela Lehman and Stern, __________________ ______________ ______ Shapiro, Weissberg & Garin were on brief, for appellant Nardone. __________________________ Kevin S. Nixon, with whom Robert Y. Murray and Ramsey & _______________ _________________ ________ Murray were on brief, for appellant Fitzgerald. ______ Nina Goodman, Attorney, Dep't of Justice, with whom Donald ____________ ______ K. Stern, United States Attorney, Paul V. Kelly and Frank A. _________ ______________ ________ Libby, Jr., Assistant United States Attorneys, and Daniel S. ___________ __________ Goodman and David S. Kris, Attorneys, Dep't of Justice, were on _______ ______________ brief, for the United States. _________________________ August 22, 1996 _________________________ SELYA, Circuit Judge. These appeals present a hothouse SELYA, Circuit Judge. _____________ of efflorescent issues set against a backdrop composed of roughly equal parts of drugs, money, and mayhem. Two of those issues  one implicating the Confrontation Clause and the other involving Fed. R. Crim. P. 24(c) raise important questions of first impression in this circuit. In the pages that follow, we offer a skeletal outline of the case and then put flesh on the bones by addressing, first, the appellants' two flagship claims. We next consider a series of discovery disputes and conclude by discussing, albeit in a more abbreviated fashion, a laundry list of other asseverations. In the end, after careful consideration of the parties' arguments and close perscrutation of the compendious record, we affirm the judgments below in large part, but reverse one defendant's conviction on three related counts and bring a contingent sentencing determination to closure. I. BACKGROUND I. BACKGROUND Overcoming the temptation to engage in Homeric recitation of the riveting facts that emerged during a seventy- day trial, we opt instead to sketch the evidence at this juncture and reserve greater detail until the need arises to place specific issues into workable context. We draw our sketch in colors that coordinate with the jury's verdicts, consistent with record support. See, e.g., United States v. Ortiz, 966 F.2d 707, ___ ____ _____________ _____ 711 (1st Cir. 1992), cert. denied, 506 U.S. 1063 (1993). _____ ______ For nearly four years Michael Fitzgerald and John Houlihan ran a ruthlessly efficient drug ring from an unlikely 4 command post: Kerrigan's Flower Shop, Charlestown, Massachusetts. The organization commanded the allegiance of numerous distributors, stationary and mobile, including Jennierose Lynch, William "Bud" Sweeney, George Sargent, and Alan Skinner. These minions, and others like them, helped the organization supply cocaine to hordes of buyers through an elaborate street-level distribution network that arranged most of its sales with the aid of electronic pagers, assigned customer codes, and preset rendezvous points. Fitzgerald and Houlihan imposed a strict code of silence on all who came into contact with them, including their own troops. They dealt severely with persons who seemed inclined to talk too freely. Joseph Nardone, a professional assassin who bragged that he was the "headache man" when the organization's chieftains had a headache, Nardone got rid of it acted as the principal enforcer. Over time, the gang's targets included Sargent, Sweeney (who survived multiple attempts on his life, but was left paralyzed from the chest down), a rival drug dealer, James Boyden III, and the latter's son and helpmeet, James Boyden IV. The Fitzgerald-Houlihan axis dominated the Charlestown scene through 1993. Ultimately, the authorities broke the code of silence and a federal grand jury indicted twelve individuals (including Fitzgerald, Houlihan, and Nardone) on a myriad of 5 charges.1 After trial, the two ringleaders and their enforcer were found guilty of engaging in a racketeering enterprise (count 1), racketeering conspiracy (count 2), conspiracy to commit murder in aid of racketeering (counts 5, 7 & 9), and conspiracy to distribute cocaine (count 20). See 18 U.S.C. 1962(c) & ___ (d), 1959(a); 21 U.S.C. 846. The jury also convicted Fitzgerald and Houlihan of aiding and abetting murder and attempted murder in aid of racketeering (counts 6, 8, 11 & 12), instigating murder for hire (counts 15, 16 & 17), engaging in a continuing criminal enterprise (count 19), and distributing cocaine (counts 21 through 29). See 18 U.S.C. 1959(a), 1958; ___ 21 U.S.C. 848, 841(a)(1). The jury found Nardone guilty of murder and attempted murder in aid of racketeering (counts 6, 8, 11 & 12), see 18 U.S.C. 1959(a), and using and carrying a ___ firearm during and in relation to crimes of violence (counts 39, 40, 42 & 43), see 18 U.S.C. 924(c). The jury also returned ___ special forfeiture verdicts. See 18 U.S.C. 1963; 21 U.S.C.  ___ 853. The district court sentenced each defendant to multiple terms of life imprisonment. These appeals blossomed. II. THE VOICE FROM THE GRAVE II. THE VOICE FROM THE GRAVE The district court admitted over objection portions of hearsay statements made by George Sargent on the theory that  ____________________ 1Of these twelve, only Fitzgerald, Houlihan, and Nardone appear as appellants before us. Three of their codefendants (Skinner, Lynch, and Joseph Houlihan) eventually pled guilty; five others were granted a separate trial; and one (William Herd) was acquitted by the same jury that convicted the three appellants. 6 Sargent's murder constituted a waiver of the Confrontation Clause vis- -vis the murderers.2 Houlihan and Nardone assign error to this order and to a salmagundi of related rulings. A. Setting the Stage. A. Setting the Stage. _________________ Sargent served as a distributor for the Fitzgerald- Houlihan organization. The police arrested him twice during 1992 on drug-trafficking charges. Both times, Sargent made voluntary statements that inculpated Fitzgerald and Houlihan in a sprawling drug conspiracy and tended to link them with several murders. The statements also furnished evidence probative of the elements of the offenses with which Nardone had been charged, but Sargent did not mention him by name. On June 28, 1992 within a month after he gave the second statement police found Sargent's corpse in a parking lot. He had been killed by a bullet wound to the head inflicted at close range. The government filed a pretrial motion for an order (1) authorizing a state trooper, Mark Lemieux, to testify about Sargent's statements following his March 1992 arrest, and (2) permitting the jury to hear a redacted version of the taped May 1992 interview conducted by Boston police detectives following Sargent's second arrest. The government argued that the appellants who had been charged with Sargent's murder waived their rights to object to the admission of his out-of-court  ____________________ 2Because the government did not prove to the district court's satisfaction that Fitzgerald shared his codefendants' intent to forestall Sargent from cooperating with the police, the court ruled that Sargent's statements could not be used against Fitzgerald. The correctness of that ruling is not before us. 7 statements on either Confrontation Clause or hearsay grounds when they successfully conspired to execute him for the express purpose of preventing his cooperation with the authorities. The district court took the motion under advisement and, near the end of the government's case in chief, admitted the challenged evidence against Houlihan and Nardone, but not Fitzgerald, see ___ supra note 2, concluding that the government had shown by clear _____ and convincing evidence that those defendants conspired to kill Sargent at least in part for the purpose of preventing him from cooperating with the police, and that such actions were tantamount to a knowing waiver of their confrontation rights. See United States v. Houlihan, 887 F. Supp. 352, 363-65 (D. Mass. ___ _____________ ________ 1995).3 B. Waiver by Homicide: The Confrontation Clause. B. Waiver by Homicide: The Confrontation Clause. _____________________________________________ To resolve Houlihan's and Nardone's main objections, we must decide whether a defendant waives his rights under the Confrontation Clause by murdering a potential witness to prevent that witness from turning state's evidence and/or testifying against him at trial. We believe that he does. It is apodictic that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. Amend. VI. This trial right is designed to assure defendants of a meaningful opportunity to cross-examine the witnesses who testify against  ____________________ 3The district court also published a preliminary opinion, United States v. Houlihan, 871 F. Supp. 1495 (D. Mass. 1994), _____________ ________ which is of little moment in regard to these appeals. 8 them, see, e.g., Delaware v. Van Arsdall, 475 U.S. 673, 678 ___ ____ ________ ____________ (1986); United States v. Laboy-Delgado, 84 F.3d 22, 28 (1st Cir. _____________ _____________ 1996), thereby enhancing the jury's ability to separate fact from fiction. Though the Confrontation Clause is a cornerstone of our adversary system of justice, it is not an absolute; there are circumstances in which the prosecution may introduce an unsworn out-of-court statement without procuring the declarant's presence at trial. See, e.g., Puleio v. Vose, 830 F.2d 1197, 1205-07 (1st ___ ____ ______ ____ Cir. 1987) (discussing exception for spontaneous exclamations), cert. denied, 485 U.S. 990 (1988). Moreover, a defendant may _____ ______ waive his right to confrontation by knowing and intentional relinquishment. See Boykin v. Alabama, 395 U.S. 238, 243 (1969) ___ ______ _______ (holding that a guilty plea is an express waiver of the constitutional right to confrontation); see also Johnson v. ___ ____ _______ Zerbst, 304 U.S. 458, 464 (1938). While a waiver of the right to ______ confront witnesses typically is express, the law is settled that a defendant also may waive it through his intentional misconduct. See, e.g., Taylor v. United States, 414 U.S. 17, 20 (1973) ___ ____ ______ _____________ (finding such a waiver when a defendant boycotted his trial); Illinois v. Allen, 397 U.S. 337, 343 (1970) (ruling that a ________ _____ defendant waives the right to confrontation by engaging in disruptive behavior requiring his removal from the courtroom during the trial). By the same token, courts will not suffer a party to profit by his own wrongdoing. Thus, a defendant who wrongfully 9 procures a witness's absence for the purpose of denying the government that witness's testimony waives his right under the Confrontation Clause to object to the admission of the absent witness's hearsay statements. See Reynolds v. United States, 98 ___ ________ _____________ U.S. (8 Otto) 145, 158 (1878) (holding that the defendant's refusal to disclose the whereabouts of a witness constituted such a waiver); Steele v. Taylor, 684 F.2d 1193, 1201-02 (6th Cir. ______ ______ 1982) (holding that a defendant who silences a witness by exploiting an intimate relationship waives the right to confrontation), cert. denied, 460 U.S. 1053 (1983); United States _____ ______ _____________ v. Balano, 618 F.2d 624, 629 (10th Cir. 1979) (concluding that a ______ defendant waives his confrontation right by threatening a witness's life and bringing about the witness's silence), cert. _____ denied, 449 U.S. 840 (1980); United States v. Carlson, 547 F.2d ______ _____________ _______ 1346, 1358-60 (8th Cir. 1976) (similar), cert. denied, 431 U.S. _____ ______ 914 (1977). Moreover, it is sufficient in this regard to show that the evildoer was motivated in part by a desire to silence __ ____ the witness; the intent to deprive the prosecution of testimony need not be the actor's sole motivation. Cf. United States v. ____ ___ ______________ Thomas, 916 F.2d 647, 651 (11th Cir. 1990) (stating that the ______ obstruction of justice statute, 18 U.S.C. 1503, requires proof that the defendant's conduct was "prompted, at least in part," by the requisite corrupt motive). Houlihan and Nardone argue, however, that the waiver- by-misconduct doctrine, even if good law, should not be employed here because Sargent was not an actual witness no charges had ______ 10 been lodged against Houlihan or Nardone at the time of Sargent's murder, and no grand jury had as yet been convened but at most a turncoat cooperating with the police. Thus, they could not have been on notice that they were waiving a trial right. We find this argument unpersuasive. Although the reported cases all appear to involve actual witnesses, see, e.g., United States v. ___ ____ _____________ Thai, 29 F.3d 785, 798 (2d Cir.), cert. denied, 115 S. Ct. 456 & ____ _____ ______ 496 (1994); United States v. Mastrangelo, 693 F.2d 269, 271-72 _____________ ___________ (2d Cir. 1982), cert. denied, 467 U.S. 1204 (1984), we can _____ ______ discern no principled reason why the waiver-by-misconduct doctrine should not apply with equal force if a defendant intentionally silences a potential witness. _________ When a defendant murders an individual who is a percipient witness to acts of criminality (or procures his demise) in order to prevent him from appearing at an upcoming trial, he denies the government the benefit of the witness's live testimony. In much the same way, when a defendant murders such a witness (or procures his demise) in order to prevent him from assisting an ongoing criminal investigation, he is denying the government the benefit of the witness's live testimony at a future trial. In short, the two situations are fair congeners: as long as it is reasonably foreseeable that the investigation will culminate in the bringing of charges, the mere fact that the homicide occurs at an earlier step in the pavane should not affect the operation of the waiver-by-misconduct doctrine. Indeed, adopting the contrary position urged by the appellants 11 would serve as a prod to the unscrupulous to accelerate the timetable and murder suspected snitches sooner rather than later. We see no justification for creating such a perverse incentive, or for distinguishing between a defendant who assassinates a witness on the eve of trial and a potential defendant who assassinates a potential witness before charges officially have been brought. In either case, it is the intent to silence that provides notice. We therefore hold that when a person who eventually emerges as a defendant (1) causes a potential witness's unavailability (2) by a wrongful act (3) undertaken with the intention of preventing the potential witness from testifying at a future trial, then the defendant waives his right to object on confrontation grounds to the admission of the unavailable declarant's out-of-court statements at trial. Before applying this holding to the case at hand, we must correctly calibrate the quantum of proof. The lower court, paying obeisance to United States v. Thevis, 665 F.2d 616, 629-30 _____________ ______ (5th Cir. Unit B), cert. denied, 456 U.S. 1008 (1982), adopted _____ ______ the minority view and decided that the government must prove the predicate facts essential to the waiver by "clear and convincing" evidence. Houlihan, 887 F. Supp. at 360. This sets too high a ________ standard. Unlike the Fifth Circuit, we think that the government need only prove such predicate facts by a preponderance of the evidence. The Thevis court compared the waiver-by-misconduct ______ 12 problem to the admissibility of in-court identifications that follow tainted out-of-court identifications. See, e.g., United ___ ____ ______ States v. Wade, 388 U.S. 218, 240 (1967) (requiring government to ______ ____ prove by "clear and convincing" evidence in such circumstances that the proposed in-court identification has a reliable independent basis). With respect, we believe the better comparison is to the admission of out-of-court statements under the coconspirator exception to the hearsay rule. See Fed. R. ___ Evid. 801(d)(2)(E). To invoke the coconspirator exception, the proponent of the statement must "show by a preponderance of the evidence" certain predicate facts, namely, "that a conspiracy embracing both the declarant and the defendant existed, and that the declarant uttered the statement during and in furtherance of the conspiracy." United States v. Sepulveda, 15 F.3d 1161, 1180 _____________ _________ (1st Cir. 1993), cert. denied, 114 S. Ct. 2714 (1994); see also _____ ______ ___ ____ Bourjaily v. United States, 483 U.S. 171, 175-76 (1987). _________ _____________ Proving the conditions precedent to the applicability of the coconspirator exception is analytically and functionally identical to proving that a defendant's wrongdoing waives his rights under the Confrontation Clause. See Steele, 684 F.2d at ___ ______ 1203; United States v. White, 838 F. Supp. 618, 624 (D.D.C. ______________ _____ 1993). We therefore align ourselves with the majority of federal appellate courts that have considered the question, see, e.g., ___ ____ Mastrangelo, 693 F.2d at 273; Steele, 684 F.2d at 1202-03; ___________ ______ Balano, 618 F.2d at 629, and set the government's burden of proof ______ at the preponderance-of-the-evidence level. 13 Measured against this more conventional benchmark, the district court's findings easily pass muster. The record amply demonstrates that Houlihan and Nardone knew when they conspired to murder Sargent that they were depriving the government of a potential witness. First, the district court supportably found that they believed Sargent was cooperating with the police and could harm them and the organization by talking.4 See Houlihan, ___ ________ 887 F. Supp. at 363-64. Second, Sargent was in fact cooperating with law enforcement officials at the time and made two voluntary statements in which he provided detailed accounts of the organization's modus operandi, descriptions of the principals' roles in various murders, and a frank admission of his own involvement in the conspiracy. While the defendants' perception of likely cooperation may well be enough to meet this prong of the test, the fact of Sargent's cooperation reinforces the inference that the killers believed Sargent was spilling the beans and murdered him on that account. Last but not least, the conspirators knew to a certainty that Sargent had keen insight into their felonious activities both from his own work in the distribution network and from sundry conversations in which they spoke openly to him in retrospect, too openly of their participation in serious crimes. This evidentiary foundation sturdily supports the  ____________________ 4It is noteworthy that, after Judge Young ruled on the admissibility of Sargent's statements, Sweeney testified that Houlihan told him, flat out, that Sargent had been killed because he "was talking to the cops." 14 conclusion that Houlihan and Nardone reasonably could have foreseen Sargent becoming a witness against them and plotted to kill him in order to deprive the government of his firsthand testimony. Hence, the district court did not err in overruling objections to the introduction of portions of Sargent's out-of- court statements insofar as those objections stemmed from the Confrontation Clause.5 C. Waiver by Homicide: The Hearsay Objections. C. Waiver by Homicide: The Hearsay Objections. ___________________________________________ Houlihan and Nardone next argue that, even if they waived their confrontation rights, the district court should not have admitted Sargent's hearsay statements because they were tinged with self-interest (having been made in police custody with a stiff sentence for distributing large quantities of narcotics in prospect) and therefore lacked "circumstantial guarantees of trustworthiness." Fed. R. Evid. 804(b)(5). On the facts of this case, we agree with the district court, see ___ Houlihan, 887 F. Supp. at 362, 367, that Houlihan's and Nardone's ________ misconduct waived not only their confrontation rights but also their hearsay objections, thus rendering a special finding of reliability superfluous.  ____________________ 5In a related vein, Houlihan and Nardone complain that the district court failed to conduct an evidentiary hearing prior to ruling on the admissibility of Sargent's statements. This complaint strikes us as a thinly-veiled effort to rehash a discovery dispute that we discuss infra Part IV(B). In all _____ events, the district court heard arguments of counsel and thirty- seven days of trial testimony before deciding that the statements could be utilized. In these circumstances, the court did not outstrip the bounds of its discretion in declining to convene a special mid-trial evidentiary hearing. 15 The Supreme Court has yet to plot the crossroads at which the Confrontation Clause and the hearsay principles embedded in the Evidence Rules intersect. The question is subtly nuanced. Though the two bodies of law are not coterminous, they husband essentially the same interests. See California v. Green, ___ __________ _____ 399 U.S. 149, 155-56 (1976). Both attempt to strike a balance between the government's need for probative evidence and the defendant's stake in testing the government's case through cross- examination. See Ohio v. Roberts, 448 U.S. 56, 65 (1980). As a ___ ____ _______ result, whether hearsay principles are more or less protective of a defendant's right to cross-examination than confrontation principles depends on the point at which the balance is struck in any particular instance (recognizing, however, that the balance can be struck at different levels in different cases). See ___ Green, 399 U.S. at 156. _____ In this case, we can take matters a step further. In constructing the balance the main interest that must be offset against the government's need for evidence is the accused's right to confrontation (for this is the right from which the right to cross-examine springs). Once the confrontation right is lifted from the scales by operation of the accused's waiver of that right, the balance tips sharply in favor of the need for evidence. See Thai, 29 F.3d at 841 (holding that a defendant who ___ ____ waives his confrontation right by wrongfully procuring a witness's silence also waives hearsay objections vis- -vis that witness); United States v. Aguiar, 975 F.2d 45, 47 (2d Cir. 1992) _____________ ______ 16 (similar); see also Steele, 684 F.2d at 1201 (noting that ___ ____ ______ "English and American courts have consistently relaxed the hearsay rule when the defendant wrongfully causes the witness' unavailability"). Here, then, inasmuch as Houlihan and Nardone waived their confrontation right by colloguing to murder Sargent, they simultaneously waived their right to object on hearsay grounds to the admission of his out-of-court statements.6 Hence, the district court appropriately eschewed the request for findings under Fed. R. Evid. 804(b)(5). Houlihan and Nardone have a fallback position. They suggest that the district court's admission of Sargent's out-of- court statements violated their rights to due process because the admissions allowed them to be convicted on the basis of unreliable evidence. See Green, 399 U.S. at 163 n.15 (ruminating ___ _____ that "considerations of due process, wholly apart from the Confrontation Clause, might prevent convictions where a reliable evidentiary basis is totally lacking"). We reject this initiative. Whatever criticisms justifiably might be levelled against Sargent's statements, the portions of those statements that Judge Young allowed into evidence are not so unreliable as  ____________________ 6We caution that a waiver of confrontation rights does not result in the automatic surrender of all evidentiary objections. For example, a district court still should exclude relevant but highly inflammatory evidence, misconduct notwithstanding, if the danger of unfair prejudice substantially outweighs the evidence's probative value. See Fed. R. Evid. 403. Presumably, such ___ evidence would have been excludable on a non-hearsay ground if the declarant were available to testify, so there is no reason to admit it when the defendant procures the declarant's unavailability. 17 to raise due process concerns. Other evidence abundantly corroborates (and in many instances replicates) Sargent's account. For instance, his description of the organization's modus operandi and his assessment of Houlihan's leadership role were confirmed and described in excruciating detail by a galaxy of live witnesses (e.g., Michael Nelson, Bud Sweeney, Cheryl Dillon).7 No more is exigible. D. The Redactions. D. The Redactions. ______________ After ruling that portions of Sargent's out-of-court statements were admissible against Houlihan and Nardone, the court limited the May 30, 1992 statements to those that "would have been competent and admissible evidence had the declarant been able to testify in person," and also excluded those portions that "directly or through innuendo" might offend the rule of Bruton v. United States, 391 U.S. 123, 126 (1968) (holding that ______ _____________ the introduction at a joint trial of a nontestifying defendant's statements that implicate a codefendant constitutes prejudicial error). Houlihan, 887 F. Supp. at 365. Houlihan and Nardone ________ objected, contending that the editing process heightened the force of Sargent's statements, and that if the interviews were to be introduced at all, then the entire text should be fair game. The district court overruled the objections.  ____________________ 7Perhaps the weakest link in the chain is Sargent's statement regarding a suggestive but ambiguous conversation that he had with Houlihan shortly before the killing of James Boyden III. But this tale is relevant principally to the three counts against Houlihan on which we order his convictions reversed. See ___ infra Part V(B). Thus, any error in admitting it is harmless. _____ 18 On appeal, Houlihan and Nardone argue less that Sargent's statements should have been redacted somewhat differently and more that they should not have been redacted at __ all.8 They assert that when a defendant waives his rights to ___ make Confrontation Clause and hearsay objections through misconduct, the absent declarant's full out-of-court statement should be admissible at the behest of either the proponent or opponent of the statement. This assertion rests on a misguided notion. The cardinal purpose of the waiver-by-misconduct doctrine is to ensure that a wrongdoer does not profit in a court of law by reason of his miscreancy. By murdering Sargent, Houlihan and Nardone denied the prosecution the benefit of his live testimony. To compensate for that denial the court allowed the government to introduce portions of the interviews that Sargent gave to the police. The defense, however, was not entitled to any compensation, and permitting it to introduce additional hearsay statements (apart from statements necessary to place the portions used by the government into context and to render them not misleading) would be to reward bloodthirstiness. We decline to stamp a judicial imprimatur on a calculated murder. Thus, we hold that a homicidal defendant may by his misconduct  ____________________ 8Though the district court applied the same redaction principles to the police officer's testimony concerning the March interview (which was not recorded or transcribed) and the tape- recorded May interview, the emphasis on appeal is on the latter. While we restrict our discussion to that recording, our holding applies with equal force to the earlier debriefing. 19 waive his hearsay objections, but that waiver does not strip the government of its right to lodge hearsay objections. It is only the party who wrongfully procures a witness's absence who waives the right to object to the adverse party's introduction of the witness's prior out-of-court statements. See White, 838 F. Supp. ___ _____ at 625; see also Steele, 684 F.2d at 1202. ___ ____ ______ To sum up, since courts should not reward parties for their own misdeeds, a prior out-of-court statement made by a witness whose unavailability stems from the wrongful conduct of a party, aimed at least in part at achieving that result, is admissible against that party as long as the statement would have been admissible had the witness testified. But the party who causes the witness's unavailability is not entitled to the same prophylaxis. Consequently, under settled jurisprudence governing totem-pole hearsay, see Fed. R. Evid. 805, the tape of Sargent's ___ interview itself constituted first-level hearsay not within any recognized exception, and the district court did not err in admitting some portions at the government's urging and refusing to admit the rest of the recording at the appellants' behest. Houlihan and Nardone offer a second reason why the trial court erred in excluding the balance of Sargent's statements. This construct pivots on Evidence Rule 106, a rule that codifies principles of fairness and completeness.9 Under  ____________________ 9The rule provides in pertinent part: When a . . . recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to 20 it, a party against whom a fragmentary statement is introduced may demand that the rest of the statement (or so much thereof as is appropriate) be admitted into evidence in order to place the excerpt in context. It is readily evident that, as the appellants maintain, Rule 106 can serve its proper function only if the trial court from time to time is prepared to permit the introduction of some otherwise inadmissible evidence. See United States v. Sutton, ___ _____________ ______ 801 F.2d 1346, 1368 (D.C. Cir. 1986). Be that as it may, completeness, like beauty, is frequently in the eye of the beholder. The trial court is in the best position to assess the competing centrifugal and centripetal forces that bear on this calculus. Thus, when the trial court, acting in its discretion, finds that proffered excerpts, standing on their own, are not misleading, its judgment is entitled to great respect. See ___ United States v. Boylan, 898 F.2d 230, 256-57 (1st Cir.), cert. _____________ ______ _____ denied, 498 U.S. 849 (1990). So it is here. ______ Houlihan and Nardone dwell on incompleteness primarily because Judge Young declared two sets of comments inadmissible. (1) Sargent told the police, inter alia, that James Boyden IV was _____ ____ selling drugs in Lynch's territory; that Fitzgerald warned him and had him beaten, but to no avail; and that he then told Sargent that he would "just have to kill" the interloper.  ____________________ introduce any other part . . . which ought in fairness to be considered contemporaneously with it. Fed. R. Evid. 106. 21 Claiming that Fitzgerald's remarks to Sargent provided Fitzgerald with a different motive to murder Sargent, Houlihan sought to have this part of Sargent's statement admitted into evidence. Houlihan claims that omitting references to Fitzgerald's involvement in the murder made it appear that he, rather than Fitzgerald, was the mastermind responsible for that crime. (2) In a similar vein, Nardone claims that the court's refusal to permit him to introduce references in the interviews to Herd's putative involvement in the Boydens' killings made it appear that Nardone carried out those murders single-handed. The court found that these incremental excerpts were "segregable" from the portions of the interviews that the government had proffered and denied the appellants' requests to admit them. Houlihan, 887 F. Supp. at 366. In assessing the ________ court's rulings, three facts are worthy of note: (1) the interview segments admitted into evidence contained no explicit reference whatever to the Boydens' murders; (2) neither Houlihan nor Nardone were charged with the slaying of James Boyden IV; and (3) Sargent never mentioned Nardone by name anywhere in the course of either debriefing. Bearing these facts in mind, we conclude that the lower court acted within the realm of its discretion in refusing to invoke Rule 106. Houlihan and Nardone also claim that the court should have admitted other portions of Sargent's interviews to impeach his credibility. See Fed. R. Evid. 806 (providing that the ___ credibility of a hearsay declarant "may be attacked . . . by any 22 evidence which would be admissible for those purposes if [the] declarant had testified as a witness"). The district court rejected this claim because it found the additional excerpts "too convoluted, collateral, or cumulative to be admitted." Houlihan, ________ 887 F. Supp. at 368. Having reviewed the items, we discern no error in their exclusion. Trial courts have considerable leeway in imposing outside limits on cross-examination. See Van Arsdall, 475 U.S. ___ ___________ at 679; Laboy-Delgado, 84 F.3d at 28. Here, the record _____________ demonstrates that the appellants had a full and fair opportunity during their cross-examination of the officers who interviewed Sargent to cast doubts upon his veracity. They made the most of this opportunity.10 By contrast, the extra material that the appellants wished to introduce lacked genuine impeachment value and promised to add virtually nothing of consequence to the grueling cross-examination. Thus, we cannot fault the district court for excluding this exiguous material. See Van Arsdall, 475 ___ ___________ U.S. at 679 (stating that cross-examination appropriately may be limited if redundant or marginally relevant); Boylan, 898 F.2d at ______ 255-56 (similar). To say more would be supererogatory. Because our painstaking review of the record reveals no solid grounding for  ____________________ 10For example, during cross-examination of Detective Harris (who taped and testified about the May 1992 interview), the appellants showed that Sargent had a lengthy criminal record; that he gave up his confreres while facing the possibility of a fifteen-year mandatory minimum sentence for drug trafficking; and that he had been promised low bail, among other things, in exchange for cooperation. 23 the claim that the district court flouted Rule 106 in any respect, we refuse to meddle. E. Prejudicial Spillover. E. Prejudicial Spillover. _____________________ There is one last leg to this phase of our journey. Fitzgerald alleges that the admission of Sargent's statements resulted in unfair prejudice to him. The record reveals none. Because the prosecution must show the existence of a conspiracy to prove a conspiracy charge, evidence implicating one coconspirator is likely to be directly relevant to the charges against his codefendants. See United States v. O'Bryant, 998 ___ ______________ ________ F.2d 21, 26 (1st Cir. 1993). Even if it is not, mistrials grounded on spillover prejudice are rare. As long as the district court limits the admission of the challenged evidence to a particular defendant or defendants, the other defendants cannot rewardingly complain unless the impact of the evidence is so devastating that, realistically, instructions from the bench cannot be expected to repair the damage. See Sepulveda, 15 F.3d ___ _________ at 1184. Silhouetted against this set of rules, the flimsiness of Fitzgerald's claim come into bold relief. What excites the emotions in one case may be routine evidence in another case. The material distilled from Sargent's statements which would have stood out like a sore thumb in a prosecution rooted in the relative gentility of white-collar crime does not seem especially sensational when evaluated in light of the other, plainly admissible evidence that permeated this seventy-day saga 24 of nonstop violence. Moreover, the district court instructed the jurors on the spot that they were not to consider Sargent's statements in deciding Fitzgerald's fate. To complement that directive, the court redacted all references to Fitzgerald from the portions of those statements that the jury heard, and it repeated its prophylactic instruction on several occasions. Under these circumstances, the presumption that jurors follow the court's instructions is intact. Ergo, Fitzgerald suffered no unfair prejudice. III. ALTERNATE JURORS III. ALTERNATE JURORS The appellants calumnize the district court because, despite their repeated objections, the court refused to discharge the alternate jurors once deliberations commenced and compounded its obduracy by allowing the alternate jurors to have intermittent contact with the regular jurors during the currency of jury deliberations. This argument requires us to address, for the first time, the interplay between violations of Fed. R. Crim. P. 24(c) and the applicable test for harmless error. The imperative of Rule 24(c) is clear and categorical: "An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." Fed. R. Crim. P. 24(c). The rule reflects the abiding concern that, once a criminal case has been submitted, the jury's deliberations shall remain private and inviolate.11 See United States v. ___ _____________  ____________________ 11Notwithstanding that Criminal Rule 23(b) permits the remaining eleven jurors to return a valid verdict if a deliberating juror is excused for cause, the wisdom of Rule 24(c) 25 Virginia Erection Corp., 335 F.2d 868, 872 (4th Cir. 1964). _______________________ Here, the appellants' claim of error is well founded. Rule 24(c) brooks no exceptions, and the district court transgressed its letter by retaining the alternate jurors throughout the deliberative period. The lingering question, however, is whether the infraction requires us to invalidate the convictions. The appellants say that it does. In their view, a violation of Rule 24(c) automatically necessitates a new trial where, as here, the defendants preserved their claim of error, or, at least, the continued contact between regular and alternate jurors that transpired in this case demands that result. The government endeavors to parry this thrust by classifying the error as benign. We find that the Rule 24(c) violation caused no cognizable harm, and we deny relief on that basis. The watershed case in this recondite corner of the law is United States v. Olano, 507 U.S. 725 (1993). There the trial _____________ _____ court permitted alternate jurors, while under instructions to refrain from engaging personally in the deliberative process, to remain in the jury room and audit the regular jurors' deliberations. See id. at 727-29. The jury found the defendants ___ ___ guilty. The court of appeals, terming the presence of alternate jurors in the jury room during deliberations "inherently prejudicial," granted them new trials although they had not  ____________________ remains debatable. We can understand a district judge's reluctance, following a long, complicated, and hotly contested trial, to release alternate jurors before a verdict is obtained. But courts, above all other institutions, must obey the rules. 26 lodged contemporaneous objections. United States v. Olano, 934 _____________ _____ F.2d 1425, 1428 (9th Cir. 1991). The Supreme Court demurred. It noted that unless an unpreserved error affects defendants' "substantial rights," Fed. R. Crim. P. 52(b), the error cannot serve as a fulcrum for overturning their convictions. 507 U.S. at 737. The Court then declared that the mere "presence of alternate jurors during jury deliberations is not the kind of error that `affect[s] substantial rights' independent of its prejudicial impact." Id. Instead, the critical inquiry is ___ whether the presence of the alternates in the jury room during deliberations actually prejudiced the defendants. See id. at ___ ___ 739. The Justices conceded that, as a theoretical matter, the presence of any outsider, including an alternate juror, may cause prejudice if he or she actually participates in the deliberations either "verbally" or through "body language," or if his or her attendance were somehow to chill the jurors' deliberations. Id. The Court recognized, however, that a ___ judge's cautionary instructions to alternates (e.g., to refrain from injecting themselves into the deliberations) can operate to lessen or eliminate these risks. See id. at 740 (remarking "the ___ ___ almost invariable assumption of the law that jurors follow their instructions") (quoting Richardson v. Marsh, 481 U.S. 200, 206 __________ _____ (1987)). Thus, absent a "specific showing" that the alternates in fact participated in, or otherwise chilled, deliberations, the trial court's instructions to the alternates not to intervene in 27 the jury's deliberations precluded a finding of plain error. Id. ___ at 741. This case presents a variation on the Olano theme. _____ Here, unlike in Olano, the appellants contemporaneously objected _____ to the district court's retention of the alternate jurors, thus relegating plain error analysis to the scrap heap. This circumstance denotes two things. First, here, unlike in Olano, _____ the government, not the defendants, bears the devoir of persuasion with regard to the existence vel non of prejudice. ___ ___ Second, we must today answer the precise question that the Olano _____ Court reserved for later decision. See id. Withal, the ___ ___ framework of the inquiry in all other respects remains the same. See id. at 734 (noting that, apart from the allocation of the ___ ___ burden of proof, a claim of error under Fed. R. Crim. P. 52(b) ordinarily requires the same type of prejudice-determining inquiry as does a preserved error). We do not discount the significance of this solitary difference, see, e.g., id. at 742 ___ ____ ___ (Kennedy, J., concurring) (commenting that it is "most difficult for the Government to show the absence of prejudice"), but "difficult" does not mean "impossible." Since Olano teaches that _____ a violation of Rule 24(c) is not reversible error per se,12 see ___ id. at 737, we must undertake a particularized inquiry directed ___ at whether the instant violation, in the circumstances of this case, "prejudiced [the defendants], either specifically or  ____________________ 12On this score, Olano confirmed what this court _____ anticipated. See United States v. Levesque, 681 F.2d 75, 80-81 ___ ______________ ________ (1st Cir. 1982) (dictum). 28 presumptively." Id. at 739. ___ Our task, then, is to decide if the government has made a sufficiently convincing case that the district court's failure to observe the punctilio of Rule 24(c) did not affect the verdicts. See, e.g., id. at 734; Kotteakos v. United States, 328 ___ ____ ___ _________ _____________ U.S. 750, 758-65 (1946). In performing this task, we find the Court's reasoning in Olano instructive. Cf. Lee v. Marshall, 42 _____ ___ ___ ________ F.3d 1296, 1299 (9th Cir. 1994) (finding Olano Court's reasoning _____ transferable to harmless error analysis in habeas case). The risks that were run here by retaining the alternates were identical to the risks that were run at the trial level in Olano,13 and the district judge's ability to minimize or _____ eliminate those risks was the same in both situations. The operative facts are as follows. Although the district court retained the alternates, subsequent physical contact between them and the regular jurors occurred only sporadically confined mostly to the beginning of each day (when all the jurors assembled prior to the commencement of daily deliberations) and lunch time (when court security officers were invariably present).14 Judge Young at no time allowed the  ____________________ 13In one respect, treating this case as comparable to Olano _____ tilts matters in the appellants' favor. There, the undischarged alternates actually stayed in the jury room during deliberations. 507 U.S. at 729-30. Here, they did not; indeed, the regular jurors and the undischarged alternates were never in physical proximity while the deliberative process was ongoing. 14On one occasion when the regular jurors were on a mid- morning break, an alternate juror retrieved a plate of delicacies from the jury room. Defense counsel brought this interlude to Judge Young's attention, and the judge immediately agreed to 29 alternates to come within earshot of the deliberating jurors. Equally as important, the court did not leave either set of venirepersons uninstructed. At the beginning of his charge, Judge Young told the alternates not to discuss the substance of the case either among themselves or with the regular jurors. He then directed the regular jurors not to discuss the case with the alternates. Near the end of the charge, the judge admonished all the talesmen that "if [the regular jurors are] in the presence of the alternates or the alternates are in the presence of the jurors, [there is to be] no talking about the case, no deliberating about the case." The regular jurors retired to the jury room for their deliberations, and the undischarged alternates retired to an anteroom in the judge's chambers (which remained their base of operations for the duration of the deliberations).  ____________________ instruct the alternates to stay out of the jury room during breaks (except for retrieving snacks from the jury room when court security officers confirmed that a break in deliberations had occurred). On another occasion defense counsel voiced suspicion that a note from the jury to the judge (requesting transcripts of several witnesses' testimony) had been written in the presence of the alternates. At counsels' urging, Judge Young, in the course of responding to the note in open court, asked each juror whether "the alternates and the deliberating jurors, or vice versa, [had] discussed the substance of the case" during the pertinent time frame. All the jurors responded in the negative, and Judge Young reinstructed the regular jurors not to discuss the case with, or deliberate in the presence of, the alternate jurors. The defendants took no exception either to the form of the inquiry or to the instructions that the court gave. 30 The deliberations lasted eleven days.15 Each morning, Judge Young asked the regular jurors and the alternate jurors, on penalty of perjury, whether they had spoken about the case with anyone since the previous day's adjournment. On each occasion, all the jurors (regular and alternate) responded in the negative. The judge reiterated his instructions to both the regular and alternate jurors at the close of every court session. In addition, he routinely warned the venire that, when they assembled the next morning before deliberations resumed, "no one is to talk about the case." On this record, we believe that the regular jurors were well insulated from the risks posed by the retention of the alternates. The judge repeatedly instructed the jurors in far greater detail than in Olano and those instructions were _____ delicately phrased and admirably specific. Appropriate prophylactic instructions are a means of preventing the potential harm that hovers when a trial court fails to dismiss alternate jurors on schedule. See Olano, 507 U.S. at 740-41; United States ___ _____ _____________ v. Sobamowo, 892 F.2d 90, 97 (D.C. Cir. 1989) (Ginsburg, J.) ________ (attaching great importance to trial court's prophylactic instructions in holding failure to discharge alternate jurors harmless); cf. United States v. Ottersburg, 73 F.3d 137, 139 (7th ___ _____________ __________ Cir. 1996) (setting aside verdict and emphasizing trial court's  ____________________ 15On the third day a regular juror had to be excused. With counsels' consent, Judge Young replaced the lost juror with an alternate and instructed the jurors to begin deliberations anew. On appeal, neither side contests the propriety of this substitution. 31 failure to provide such instructions). Courts must presume "that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case," Francis v. Franklin, 471 U.S. 307, 324 n.9 _______ ________ (1985), and that they follow those instructions. Here, we have more than the usual presumption that the jury understood the instructions and followed them. The court interrogated the entire panel regular jurors and undischarged alternates on a daily basis, and received an unbroken string of assurances that the regular jurors had not spoken with the alternates concerning the substance of the case, and vice versa. Just as it is fitting for appellate courts to presume, in the absence of a contrary indication, that jurors follow a trial judge's instructions, so, too, it is fitting for appellate courts to presume, in the absence of a contrary indication, that jurors answer a trial judge's questions honestly. One last observation is telling. Over and above the plenitude of instructions, there is another salient difference between this case and Ottersburg (the only reported criminal case __________ in which a federal appellate court invalidated a verdict due to the trial court's failure to discharge alternate jurors). Here, unlike in Ottersburg, 76 F.3d at 139, the judge at no time __________ permitted the alternates to sit in on, or listen to, the jury's deliberations (even as mute observers). Hence, the alternates had no opportunity to participate in the deliberations, and nothing in the record plausibly suggests that they otherwise 32 influenced the jury's actions. If the mere presence of silent alternates in the jury room during ongoing deliberations cannot _______________________________________________ in and of itself be deemed to chill discourse or establish prejudice, see Olano, 507 U.S. at 740-41, it is surpassingly ___ _____ difficult to imagine how absent (though undischarged) alternates, properly instructed, could have a toxic effect on the deliberative process.16 We will not paint the lily. Given the lack of any contact between regular and alternate jurors during ongoing deliberations, the trial judge's careful and oft-repeated instructions, the venire's unanimous disclaimers that any discussions about the case took place between the two subgroups, the overall strength of the prosecution's evidence on virtually all the counts of conviction, and the discriminating nature of the verdicts that were returned (e.g., the jury acquitted the appellants on sundry counts and also acquitted the fourth defendant, Herd, outright), we conclude that the government has carried its burden of demonstrating that the outcome of the trial would have been precisely the same had the district court dismissed the alternate jurors when the jury first retired to deliberate. It follows that because the appellants suffered no  ____________________ 16In Cabral v. Sullivan, 961 F.2d 998 (1st Cir. 1992), a ______ ________ case that antedated Olano, we considered a civil analog to _____ Criminal Rule 24(c) and stated that "[w]hen a trial court allows an . . . alternate juror[] to deliberate with the regular jurors . . . an inherently prejudicial error is committed, and the substantial rights of the parties are violated." Id. at 1002. ___ In the instant case, unlike in Cabral, there is neither proof nor ______ reason to suspect that the undischarged alternates participated in the regular jurors' deliberations. 33 prejudice in consequence of the court's bevue, they are not entitled to return to square one. IV. DISCOVERY DISPUTES IV. DISCOVERY DISPUTES The appellants stridently protest a series of government actions involving document discovery. We first deal with a claim that implicates the scope of the Jencks Act, 18 U.S.C. 3500, and then treat the appellants' other asseverations. A. Scope of the Jencks Act. A. Scope of the Jencks Act. _______________________ The Jencks Act provides criminal defendants, for purposes of cross-examination, with a limited right to obtain certain witness statements that are in the government's possession. That right is subject to a temporal condition: it does not vest until the witness takes the stand in the government's case and completes his direct testimony. Id.  ___ 3500(a). It is also subject to categorical, content-based restrictions delineated in the statute: a statement is not open to production under the Jencks Act unless it (i) relates to the same subject matter as the witness's direct testimony, id.  ___ 3500(b), and (ii) either comprises grand jury testimony, id.  ___ 3500(e)(3), or falls within one of two general classes of statements, namely, (1) a written statement made by [the] witness and signed or otherwise adopted or approved by him; (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with 34 the making of such oral statement . . . . 18 U.S.C. 3500(e)(1)-(2). In this case, the government agents who led the investigation instructed all but the most senior prosecutors to refrain from taking notes during pretrial interviews. The appellants decried this practice in the district court, but Judge Young found that even the deliberate use of investigatory techniques designed to minimize the production of written reports would not violate the Jencks Act. Before us, the appellants renew their challenge. We, too, think that it lacks force. The Jencks Act does not impose an obligation on government agents to record witness interviews or to take notes during such interviews. After all, the Act applies only to recordings, written statements, and notes that meet certain criteria, not to items that never came into being (whether or not a prudent investigator cynics might say an unsophisticated investigator would have arranged things differently). See ___ United States v. Lieberman, 608 F.2d 889, 897 (1st Cir. 1979) _____________ _________ (rejecting a claim that the government has "a duty to create Jencks Act material by recording everything a potential witness says"), cert. denied, 444 U.S. 1019 (1980); accord United States _____ ______ ______ _____________ v. Bernard, 625 F.2d 854, 859 (9th Cir. 1980); United States v. _______ ______________ Head, 586 F.2d 508, 511-12 (5th Cir. 1978); United States v. ____ ______________ Fielbogen, 494 F. Supp. 806, 814 (S.D.N.Y. 1980), aff'd, 657 F.2d _________ _____ 265 (2d Cir. 1981) (table). It has been suggested that if there were evidence that lawmen "engaged in manipulative or coercive 35 conduct" during the course of an audience with a particular witness, the failure to record that event might give rise to a Jencks Act violation. Lieberman, 608 F.2d at 897 (dictum). But _________ this dictum, even if it might be of some moment in a proper case (a matter on which we take no view) is cold comfort to the appellants. There is no proof of such a scenario here,17 and, without such proof, government interviews with witnesses are "presumed to have been conducted with regularity." Id. ___ In the absence of a contrary legislative command and none currently exists the choice among available investigatory techniques is, within wide limits, for the Executive Branch in contradistinction to the Judicial Branch. The practice challenged here is not beyond the pale. Accordingly, we hold that the government did not violate the Jencks Act by instructing agents to minimize note-taking.18 Still, we do not mean to imply that we endorse the practice. Eschewing tape recordings and ordering law enforcement agents not to take notes during pretrial interviews is risky  ____________________ 17The appellants claim that instructing agents not to take notes constitutes a deliberate strategy to manipulate the quantity of discoverable material. But, this is simply not the sort of manipulation to which the panel referred in Lieberman. _________ 18In a related vein, we likewise reject the appellants' assertion that the government violated the Jencks Act by parading law enforcement officers rather than percipient witnesses before the grand jury. "Hearsay evidence is a sufficient basis for an indictment," and the mere fact that the government chooses to rely on hearsay evidence in presenting its case before a grand jury raises "no hint of government misconduct." United States v. _____________ Font-Ramirez, 944 F.2d 42, 46 (1st Cir. 1991), cert. denied, 502 ____________ _____ ______ U.S. 1065 (1992). 36 business and not guaranteed to redound either to the sovereign's credit or to its benefit. By adopting a "what we don't create can't come back to haunt us" approach, prosecutors demean their primary mission: to see that justice is done. In more parochial terms, the government also loses the advantage of records that it may subsequently need to safeguard against witnesses changing their stories or to refresh recollections dimmed by the passage of time. By and large, the legitimate interests of law enforcement will be better served by using recording equipment and/or taking accurate notes than by playing hide-and-seek. B. Delayed Disclosures. B. Delayed Disclosures. ___________________ The appellants also complain that delays attributable to governmental foot-dragging unfairly hampered their ability to cross-examine witnesses. The centerpiece of this complaint is the appellants' insistence that, in addition to going very slowly in creating potentially discoverable materials, the prosecutors withheld extant materials, such as existing notes, under various pretexts, claiming that the notes comprised attorney work-product and that they did not contain substantially verbatim recitals of witnesses' statements. The appellants' complaint is unproductive. Acting with commendable thoroughness, the district court reviewed all the prosecutors' notes and kindred materials in camera to determine which documents (or portions of documents) were producible under the Jencks Act. The government turned over what the court 37 ordered it to produce at the time(s) when the court ordered production to be made. In all events, we have held with a regularity bordering on the echolalic that "delayed disclosure claims cannot succeed unless the aggrieved defendant demonstrates prejudice arising from the delay." Sepulveda, 15 F.3d at 1179 (citing cases); see _________ ___ also United States v. Saccoccia, 58 F.3d 754, 781 (1st Cir. ____ ______________ _________ 1995), cert. denied, 116 S. Ct. 1322 (1996). In this context, _____ ______ demonstrating prejudice demands red meat and strong drink but the appellants have served up much less hearty fare. They articulate how the delayed disclosures supposedly impeded their ability to cross-question witnesses largely by reference to two examples. Neither example is compelling. First, the appellants suggest that they were unfairly surprised because, after Nardone's henchman, Michael Nelson, testified at trial that Fitzgerald alone had given Nardone a contract on the life of James Boyden III, they obtained the grand jury testimony of a subsequent witness (a law enforcement officer) which indicated that Nardone, in chatting with Nelson, implicated both Houlihan and Fitzgerald in ordering the hit.19 ____ The appellants claim that the inconsistency between the officer's grand jury testimony, on one hand, and Nelson's trial testimony,  ____________________ 19When this inconsistency surfaced, the government contended that the grand jury witness simply made a mistake, and pointed out that, according to the prosecutors' notes, Nelson stated in his pretrial interview that Fitzgerald alone issued the order. At this juncture the court directed the prosecutors to disclose the summary prepared by a government attorney for the use of the officer who appeared before the grand jury. 38 on the other hand, could have been exploited to discredit Nelson on cross-examination. We are skeptical; given that Nelson's statements during his pretrial interview, see supra note 19, and ___ _____ at trial were consistent, this tidbit would have been of dubious value for impeachment purposes. Moreover, while Nelson was still ______________________ on the witness stand, the appellants had possession of other _____________________ documents that revealed the same inconsistency. For these reasons, we are fully satisfied that any delay in the disclosure of the law enforcement officer's grand jury testimony did not affect the outcome of the trial. Consequently, the incident fails to prove the appellants' point. See, e.g., United States ___ ____ _____________ v. Devin, 918 F.2d 280, 290-91 (1st Cir. 1990) (explaining that _____ delayed disclosure of impeachment material does not warrant reversal if the material would not have altered the verdict). The second vignette concerns a prosecutor's note to the effect that Nardone told Nelson that there were two reasons why ___ Sargent had to be killed: first, because Houlihan felt that Sargent "was a risk" and "could hurt [Houlihan] by talking"; and second, "as a showing of respect to the Murrays" (a bookmaking group to whom Sargent was heavily indebted). Regarding the second reason, Nelson explained that Fitzgerald and Houlihan asked the Murrays to post $50,000 bail for Bobby Levallee, an organization stalwart, in exchange for having Sargent killed. Because the government did not reveal this note until after Nelson had completed his testimony, the appellants' thesis runs, they were unable to cross-examine him efficaciously. 39 This proffer, too, is wide of the mark. Under any circumstances, the note has only marginal evidentiary value in light of the extensive proof confirming Houlihan's desire to silence Sargent in order to keep him from telling the government what he knew a desire that the note itself acknowledges. Even more important, the appellants had sufficient notice of the alternative "gambling debts" motive well before Nelson left the stand. Nelson himself testified on direct examination that Fitzgerald and Houlihan wanted Sargent killed for "two reasons": because they believed that the police had coopted him and because ___ they were concerned about "all [Sargent's] gambling debts." And, moreover, the record indicates that the appellants had the rest of the prosecutors' notes (some of which discussed the alternative motivation) in hand before Nelson completed his ______ testimony; indeed, Houlihan's counsel relied on those notes to elicit information on cross-examination about Sargent's gaming debts and his connection to the Murrays. Under these circumstances, no reversible error inhered. See, e.g., ___ ____ Saccoccia, 58 F.3d at 781 (finding no prejudice from delay when _________ defense counsel obtained information in time to prepare cross- examination); United States v. Hodge-Balwing, 952 F.2d 607, 609 ______________ _____________ (1st Cir. 1991) (finding no prejudice from late delivery of documents when the prosecutor's opening statement alerted the defense to the same information). If more were needed and we doubt that it is the sockdolager is the district court's volunteered ruling that the 40 appellants could recall Nelson during their case for further cross-examination on the basis of the information disclosed in the note. The appellants chose to let this opportunity pass. The rule is clear that a defendant's failure to recall a witness, despite permission to do so, undermines a claim of prejudice based on a disclosure that materialized after the witness finished testifying (but before the trial ended). See United ___ ______ States v. Arboleda, 929 F.2d 858, 864 (1st Cir. 1991); United ______ ________ ______ States v. Dunn, 841 F.2d 1026, 1030 (10th Cir. 1988). ______ ____ C. Supervisory Power. C. Supervisory Power. _________________ In a last-ditch effort to right a sinking ship, the appellants embrace a dictum contained in United States v. Osorio, _____________ ______ 929 F.2d 753, 763 (1st Cir. 1991) ("When confronted with extreme misconduct and prejudice as a result of delayed disclosure, this court will consider invoking its supervisory powers to secure enforcement of better prosecutorial practice and reprimand of those who fail to observe it.") (citation and internal quotation marks omitted). Based on this dictum, they ask that we unleash our supervisory power and vacate their convictions as an object lesson to the government. In the bargain, they suggest that we issue a blanket rule prohibiting prosecutors from instructing their colleagues in law enforcement not to take notes during witness interviews.20  ____________________ 20Respecting, as we do, the coordinate powers of the other two branches of government, we decline to issue any such blanket proscription. See supra Part IV(A) (discussing particulars of ___ _____ appellants' underlying objection). 41 Federal courts should refrain from dismissing charges or overturning convictions merely as a device to conform executive conduct to judicially favored norms. Rather, the courts' supervisory power should be used in this way only if plain prosecutorial misconduct is coupled with cognizable prejudice to a particular defendant. See United States v. ___ ______________ Santana, 6 F.3d 1, 10-11 (1st Cir. 1993); United States v. _______ ______________ Pacheco-Ortiz, 889 F.2d 301, 310 (1st Cir. 1989); see also United _____________ ___ ____ ______ States v. Hasting, 461 U.S. 499, 507 (1983) (holding that when ______ _______ prosecutorial misconduct constitutes no more than harmless error, no relief is warranted under supervisory power). Here, both prerequisites for judicial intervention are wanting. First and foremost, the tactics complained of if improper at all fall far short of a showing of egregious misconduct that might impel a federal court to consider the drastic step of vacating a conviction as a sanction against overzealous prosecutors. Second, the delayed disclosures did not harm the defendants' substantial rights. See United States v. ___ ______________ Walsh, 75 F.3d 1, 8 (1st Cir. 1996) (demonstrating prejudice _____ requires more than mere "assertions that the defendant would have conducted cross-examination differently"). That ends the matter. The supervisory power is strong medicine and, as we have said, "[p]otent elixirs should not be casually dispensed." Santana, 6 F.3d at 10. There is no reason _______ to write such a prescription in the circumstances of this case. V. MISCELLANEOUS V. MISCELLANEOUS 42 The appellants, represented by able counsel, marshal a plethora of other arguments. We address some of these arguments, explaining briefly why we accept or reject them. The points that we do not mention are insubstantial and may be dismissed without elaboration. A. Murder for Hire. A. Murder for Hire. _______________ Fitzgerald and Houlihan, in chorus, challenge the sufficiency of the evidence supporting their murder-for-hire convictions arising out of the annihilations of Boyden III (count 15) and Sargent (count 16), and the attempts on Sweeney's life (count 17). With one exception, the sole ground on which these challenges rest is the allegation that the prosecution fell short of establishing the requisite nexus between the use of interstate facilities and the defendants' biocidal activities.21 The challenge fails. The controlling legal standard is prosaic. "When a criminal defendant undertakes a sufficiency challenge, all the evidence, direct and circumstantial, must be viewed from the government's coign of vantage, and the viewer must accept all reasonable inferences from it that are consistent with the verdict." United States v. Valle, 72 F.3d 210, 216 (1st Cir. _____________ _____ 1995). Though each element of the offense must be proven beyond a reasonable doubt, the government's burden "may be satisfied by either direct or circumstantial evidence, or any combination  ____________________ 21The exception relates to count 15, as to which Houlihan offers a wider-ranging sufficiency challenge. We address that challenge separately. See infra Part V(B). ___ _____ 43 thereof." United States v. Gifford, 17 F.3d 462, 467 (1st Cir. ______________ _______ 1994). If a rational jury, indulging all credibility calls in favor of the verdict, could find the defendant guilty on this basis, then the inquiry terminates. See United States v. David, ___ _____________ _____ 940 F.2d 722, 730 (1st Cir. 1991), cert. denied, 502 U.S. 1046 _____ ______ (1992). Moving from the general to the specific, the murder- for-hire statute makes it unlawful to use or cause another person to use "any facility in interstate or foreign commerce, with intent that a murder be committed . . . as consideration for . . . anything of pecuniary value." 18 U.S.C. 1958. In this case, the prosecution sought to convict by proving, inter alia, that _____ ____ the plotters used telephone calls as a means of accomplishing their ends. The appellants did not claim below, and do not now claim, that telephone lines fall outside the rubric of "facilities in interstate commerce." We therefore assume that point in the government's favor, see United States v. Slade, 980 ___ _____________ _____ F.2d 27, 30 (1st Cir. 1992) ("It is a bedrock rule that when a party has not presented an argument to the district court, she may not unveil it in the court of appeals."); United States v. ______________ Zannino, 895 F.2d 1, 17 (1st Cir.) (noting "settled appellate _______ rule" that issues not briefed and properly developed on appeal are waived), cert. denied, 494 U.S. 1082 (1990), and consider _____ ______ only the claim that they do advance: that the evidence fails to show the use of telephones in the course of committing the charged crimes. 44 In interpreting 18 U.S.C. 1958, it is entirely appropriate to look to case law construing the Travel Act, 18 U.S.C. 1952. See United States v. Edelman, 873 F.2d 791, 794 ___ _____________ _______ (5th Cir. 1989) (explaining that Travel Act jurisprudence is a proper referent because "the obvious purpose" of the murder-for- hire statute is "to supplement" the Travel Act); see also S. Rep. ___ ____ No. 225, 98th Cong., 1st Sess. 306, reprinted in 1984 _________ __ U.S.C.C.A.N. 3182, 3485 (noting that the murder-for-hire statute "follows the format" of the Travel Act). In United States v. _____________ Arruda, 715 F.2d 671 (1st Cir. 1983), a Travel Act case, we ______ stated: "There is no requirement that the use of the interstate facilities be essential to the scheme: it is enough that the . . . use of interstate facilities makes easier or facilitates the unlawful activity." Id. at 681-82 (citations and internal ___ quotation marks omitted). This is the commonly held view, see, ___ e.g., United States v. Lozano, 839 F.2d 1020, 1022 (4th Cir. ____ _____________ ______ 1988); United States v. Smith, 789 F.2d 196, 203 (3d Cir.), cert. _____________ _____ _____ denied, 479 U.S. 1017 (1986), and we confirm today that the non- ______ essentiality principle announced in Arruda is embodied in the ______ murder-for-hire statute. The key, then, is whether the jury plausibly could have found that the appellants actually used a telephone to facilitate Sargent's and Boyden the elder's deaths and the attempts on Sweeney's life. We hasten to add, however, that there is no requirement that each accused use a facility in interstate commerce, or that each accused intend such a facility to be used, 45 or even that each accused know that such a facility probably will be used. See Edelman, 874 F.2d at 795; see also United States v. ___ _______ ___ ____ _____________ Heacock, 31 F.3d 249, 255 n.10 (5th Cir. 1994) (applying _______ identical principle under Travel Act); United States v. Sigalow, _____________ _______ 812 F.2d 783, 785 (2d Cir. 1987) (same); United States v. _____________ McPartlin, 595 F.2d 1321, 1361 (7th Cir.) (same), cert. denied, _________ _____ ______ 444 U.S. 833 (1979). Hence, if the government proves that one of the participants used the telephone or some comparable interstate facility in furtherance of the scheme, then the required facilitative nexus is established as to all participants. In this case, we think that the jury rationally could find a facilitative nexus between the use of telephones and the criminal activities underlying the counts of conviction. By March of 1992, Fitzgerald, a parole violator, had taken up involuntary residence in a state penitentiary. The record, together with reasonable inferences extractable therefrom, permitted the jury to find that he made daily telephone calls from prison to an indicted coconspirator, John Doherty, at Kerrigan's Flower Shop; and that Doherty, acting as Fitzgerald's internuncio, supplied Nardone with the weaponry needed to mount the attacks. Telephone records introduced into evidence also indicate that Fitzgerald called Nardone several times at Lynch's apartment in and around the dates on which the murders were to occur. Since the jury reasonably could regard the various calls as an important link in the communicative chain that led to 46 murder and attempted murder, the appellants' challenge founders.22 B. The Murder of James Boyden III. B. The Murder of James Boyden III. ______________________________ Houlihan asserts that his convictions on count 5 (conspiring to murder James Boyden III in aid of racketeering), count 6 (abetting that murder), and count 15 (hiring another to perform that murder) cannot stand. His major theme is that the government failed to link him to the murder in any meaningful way. We find merit in this proposition. To convict Houlihan for conspiring to murder in aid of racketeering, see 18 U.S.C. 1959(a), or for abetting the ___ murder, see id., the government had to prove that (1) the ___ ___ organization masterminded by Fitzgerald and Houlihan constituted a racketeering enterprise; (2) that, depending on the count, Houlihan conspired to commit, or aided and abetted the commission of, the murder; and (3) that Houlihan participated in the arrangement "for the purpose of maintaining or increasing [his] position in a [racketeering] enterprise." Id. By like token, ___ under the murder-for-hire statute the government had to prove (1) that Houlihan joined in causing the killing of another, (2)  ____________________ 22Although not an element of the offense, it is pellucid that the jury easily could have believed Fitzgerald's actions vis- -vis Sargent and Sweeney were undertaken with Houlihan's knowledge and consent. To cite just one example, Houlihan personally paid Nardone his $5,000 "headache elimination" fee at Kerrigan's Flower Shop on the day after Nardone ended Sargent's life. Further examples are unnecessary. It suffices to say that extensive evidence pointed to the conclusion that Fitzgerald and Houlihan jointly orchestrated both Sargent's slaying and Sweeney's travails. 47 paying a price or other consideration, (3) with the specific intent to commit the substantive crime (murder), and (4) that interstate facilities were used by one or more of the participants in the course of perpetrating the crime. See 18 ___ U.S.C. 1958. A common thread runs through all three counts. In one form or another, the government had to prove beyond a reasonable doubt that in the spring of 1992 Houlihan "conspired to murder James Boyden III" (count 5), and/or "aided, abetted, counselled, commanded [or] induced" that murder (count 6), and/or used "facilities in interstate commerce . . . to hire other individuals and to arrange the intended murder of James Boyden III" (count 15). Under each of these counts, the government had to show at a bare minimum that Houlihan intended the murder of James Boyden III to take place and that he acted upon that intent. See, e.g., United States v. Santiago, 872 F.2d 1073, ___ ____ ______________ ________ 1079 (1st Cir.) (explaining that proof of a charged conspiracy requires, inter alia, proof of intent to commit the substantive _____ ____ offense), cert. denied, 492 U.S. 910 & 493 U.S. 832 (1989); _____ ______ United States v. Loder, 23 F.3d 586, 591 (1st Cir. 1994) (stating _____________ _____ that an aider and abettor must "consciously share[] the specific criminal intent of the principals"); 18 U.S.C. 1958 (specifically requiring proof that the defendant acted with "intent that a murder be committed"). In other words, as Judge Young instructed the jury, the government had to show that Houlihan "intentionally arranged for the murder of James Boyden 48 III by Joseph Nardone," or "aided and abetted that crime," and that he had the "specific intent" of causing the murder. We have combed the record in light of this highly specific subset of charges to determine whether the government satisfied its burden of proving beyond a reasonable doubt that Houlihan perpetrated these three interrelated crimes. We have come up empty. In our judgment there is insufficient evidence that Houlihan, whatever other atrocities he may have committed, intended to bring about the execution of James Boyden III, or that he participated in any culpable way in the commission of that crime. The evidence depicts Fitzgerald as the leader of the organization and Houlihan as his second-in-command. The government's theory is that Nardone killed Boyden III, and that Fitzgerald and Houlihan jointly directed him to do so. But the government's star witness, Nelson, testified that, according to Nardone, Fitzgerald alone ordered the murder.23 This seems reasonable in view of the fact that the murder grew out of events surrounding the assassination of the victim's son (Boyden IV). The younger Boyden, against Fitzgerald's explicit warning, had continued to sell cocaine in the "sales territory" assigned to Jennierose Lynch (Fitzgerald's paramour). After several violent encounters, Boyden IV turned up  ____________________ 23Indeed, when it was pointed out that a grand jury witness had testified otherwise, the government protested that the witness had made a mistake. See supra note 19. The grand jury ___ _____ testimony was not admitted at the trial. 49 dead. The government charged Fitzgerald, Lynch, and Herd but not Houlihan with that murder. As recounted earlier, the judge granted Fitzgerald's motion for a mistrial on those charges (and he presumably remains subject to retrial); the judge ordered the charges against Lynch dropped as part of an overall plea bargain; and the jury acquitted Herd. The record strongly suggests that the son's murder set the stage for the father's murder, and that the killings were related. The government makes no effort to implicate Houlihan in the former crime, and there is only a tenuous set of inferences linking him to the latter crime. Virtually the only intimation that Houlihan may have played a role in the killing of Boyden III comes from Sargent's tape-recorded statement during which the following colloquy transpired (references in the colloquy to "Boyden, Sr." refer to James Boyden III): SARGENT: I was having a couple of drinks, SARGENT: and [Houlihan] mentioned . . . that that there's two . . . that's going to go. * * * . . . John Houlihan mentioned before that he could have somebody kill anybody he wants. * * * DET. HARRIS: There was the homicide of James DET. HARRIS: Boyden, Sr. SARGENT: Right. SARGENT: DET. HARRIS: Would you tell us about that DET. HARRIS: homicide? SARGENT: All I know is when I had talked to SARGENT: 50 John in the bar, he had mentioned there was going to be two . . . people dead, and that night that same night that I talked to him, that's when Boyden Sr. got killed . . . DET. HARRIS: How many hours before Boyden DET. HARRIS: Sr. was killed did that conversation with [Houlihan] take place? SARGENT: I'd say about three hours. SARGENT: Passing obvious questions about the reliability of this uncorroborated hearsay statement, see supra note 7 & accompanying ___ _____ text, this seems too porous a foundation on which to rest homicide charges. Laying out the inferential chain on which the government's theory depends illustrates its weakness. From the dialogue that we have quoted, the government suggests that a jury could plausibly infer that Houlihan was referring to the upcoming murder of James Boyden III in his "two . . . that's going to go" comment; and that, from this inference, the jury could plausibly infer that Houlihan intended to bring about that murder and participated in it in some meaningful way. This is simply too great a stretch. Houlihan did not mention James Boyden III in his conversation with Sargent, and it is not even clear that Sargent understood Houlihan to be referring to any particular individuals. Rather, the import of Sargent's comment seems to be that succeeding events filled in the blanks. And even if we accept the first suggested inference, the record hardly will support the further inference that Houlihan had a specific intent to murder James Boyden III, or that he abetted the ensuing crime. At most, the conversation suggests an awareness of a planned 51 slaying, not necessarily participation in it. The government tries to buttress these strained inferences by pointing to Sargent's parroting of Houlihan's statement that he "could have somebody kill anybody" and labelling this as evidence that Houlihan directed the commission of this particular murder. But that argument proves too much. On the government's reasoning, Houlihan could have been charged and convicted of any murder. The government also points out ___ that, on the day after the murder, Nardone collected his fee at Kerrigan's Flower Shop. Because this bore some resemblance to the method of payment that Houlihan employed after Nardone murdered Sargent, see supra note 22, the government asks us to ___ _____ infer that Houlihan also must have arranged this payment. We think for two reasons that the suggested inference is dubious. First, the difference in payment methodology is significant: on the latter occasion (Sargent's murder), the government proved that Houlihan personally paid the fee to Nardone; on the former occasion (Boyden the elder's murder), it did not. Second, the record shows that Fitzgerald not only ordered the murder of James Boyden III but also, though imprisoned, remained in daily contact with Doherty, and that Doherty (who was based at Kerrigan's) or any of several other underlings could have arranged the payment. Even so, given the working relationship between Houlihan and Fitzgerald and their use of Nardone as a triggerman in connection with Sargent's murder and the attempts on Sweeney's life, the question of evidentiary sufficiency is close. In the 52 end, however, we do not think that the evidence measures up to the requirement which we apply de novo that a reasonable jury be able to find each element of the crime to have been proven beyond a reasonable doubt. Given Nelson's uncontradicted testimony that only one individual Fitzgerald sanctioned the execution of James Boyden III, and also given the nexus between the Boydens' murders, we believe that the chain of inferences forged by the prosecution is too loose (albeit by the slimmest of margins) to hold Houlihan criminally responsible for the charged crimes. C. Severance. C. Severance. _________ The reader will recall that the indictment charged Herd, Lynch, and Fitzgerald but not Houlihan and Nardone with offenses related to the murder of James Boyden IV. Houlihan and Nardone contend that the court had an obligation to sever their trials from the trial of the counts relating to the Boyden IV murder.24 We disagree. When several defendants are named in a unified indictment, there is a strong presumption that they should be tried together. See Zafiro v. United States, 506 U.S. 534, 538- ___ ______ _____________ 39 (1993); O'Bryant, 998 F.2d at 25. To obtain a severance under ________ such circumstances, a defendant must demonstrate extreme prejudice, such as by showing a "serious risk that a joint trial  ____________________ 24Ironically, none of the counts related to this murder bore fruit: the jury found Herd not guilty; the court relieved Lynch of responsibility when she pleaded guilty to other counts; and the court granted Fitzgerald a mistrial. 53 would compromise a specific trial right," or would "prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539. ______ Houlihan and Nardone cannot scale these heights. Their central thesis is that the government's evidence concerning the Boyden IV murder tended to show that the victim was slaughtered in an organization-related turf battle, and therefore threatened to infect the jury's consideration of other counts. But they dress this thesis in the gossamer vestments of speculation and surmise. That is not enough. "There is always some prejudice in any trial where more than one offense or offender are tried together but such `garden variety' prejudice, in and of itself, will not suffice" as a basis for obligatory severance. O'Bryant, ________ 898 F.2d at 246. To be sure, there is a gray area in which reasonable people might disagree about the advisability of a severance. In the vast majority of those cases, however, the severance battle is conclusively won or lost in the district court. See O'Bryant, ___ ________ 998 F.2d at 25 (explaining that the court of appeals ordinarily should defer to the district court's evaluation of the necessity for separate trials); United States v. Natanel, 938 F.2d 302, 308 _____________ _______ (1st Cir. 1991) (holding that a denial of severance will only be reversed for a "manifest abuse of discretion"), cert. denied, 502 _____ ______ U.S. 1079 (1992). This case falls within the sweep of that generality, not within the long-odds exception to it. Not only is the inference of undue prejudice that the appellants seek to 54 draw somewhat attenuated, but also any possible prejudice was dissipated by the trial court's firm, carefully worded, and oft- repeated instructions to the jurors, forbidding them from considering the evidence anent the murder of Boyden the younger in deciding the charges against either Houlihan or Nardone.25 On this record, we are confident that the trial court did not abuse its considerable discretion in denying the requested severance. See, e.g., Boylan, 998 F.2d at 25; United States v. Gomez-Pabon, ___ ____ ______ _____________ ___________ 911 F.2d 847, 859-60 (1st Cir. 1990), cert. denied, 498 U.S. 1074 _____ ______ (1991). D. The Ford/McDonald Conundrum. D. The Ford/McDonald Conundrum. ___________________________ At trial the government called Steven Ford and Edwin McDonald as witnesses regarding the murder of James Boyden IV. Houlihan and Nardone successfully solicited limiting instructions. Prior to each witness's testimony Judge Young admonished the jury that the testimony was admissible only against Fitzgerald, Herd, and Lynch, and not against Houlihan or Nardone. Notwithstanding these limiting instructions, Houlihan and Nardone asked to cross-examine Ford and McDonald. The court blocked that maneuver. Houlihan and Nardone press the point in this venue, alleging that the court's ruling violated their confrontation rights and otherwise constituted an improper exercise of discretion.  ____________________ 25The court enhanced the efficacy of the limiting instructions by insisting that all the government's evidence relating to this murder be presented compactly at the same point in the trial. This is a salutary practice, and we commend it generally to trial courts confronted with analogous situations. 55 To demonstrate a violation of the Confrontation Clause, a defendant must show that he was "prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." Van ___ Arsdall, 475 U.S. at 680. Here, there was no abridgement of the _______ defendants' constitutional rights. The Confrontation Clause demands that a defendant have the opportunity to confront and cross-examine the witnesses against him; at least in the absence ___________ of special circumstances and none appear here the Clause does not create a right to confront or cross-examine persons who appear as witnesses exclusively against others (even if the others are codefendants in a joint trial). Because neither Ford nor McDonald was a witness "against" either Houlihan or Nardone, the constitutional claim is stillborn. Absent a constitutional violation, "appellate courts will grant relief from the shackling of cross-examination only for manifest abuse of discretion." Boylan, 898 F.2d at 254. We ______ discern no trace of abuse in this instance. Despite the lack of cross-examination,26 the limiting instructions fully protected Houlihan's and Nardone's legitimate interests. Furthermore, allowing counsel for Houlihan and Nardone to cross-examine Ford and McDonald could well have had a boomerang effect, leading the jury to believe that, contrary to the judge's instructions, the testimony had some relevance to the charges against their  ____________________ 26Of course, these witnesses did not emerge unscathed. Ford and McDonald were vigorously cross-examined by counsel for the implicated defendants, Fitzgerald included. 56 clients. Hence, the restriction on cross-examination was well- tailored to the occasion. E. Rulings Related to the Partial Mistrial. E. Rulings Related to the Partial Mistrial. _______________________________________ After granting Fitzgerald a partial mistrial on the counts pertaining to the murder of James Boyden IV, the district court refused to grant his motion to strike the testimony of three witnesses, each of whom testified to some extent about that murder,27 or in the alternative, to declare a mistrial on the remaining counts against him. Before us, Fitzgerald claims that the testimony had no relevance to the surviving counts, and included details about the slaying of the younger Boyden that might well have horrified the jurors and prejudiced them against him. We review the district court's ruling to admit or exclude particular evidence for abuse of discretion. See United ___ ______ States v. Rivera-Gomez, 67 F.3d 993, 997 (1st Cir. 1995); United ______ ____________ ______ States v. Holmquist, 36 F.3d 154, 163 (1st Cir. 1994), cert. ______ _________ _____ denied, 115 S. Ct. 1797 (1995). The same standard pertains to ______ motions to strike evidence previously admitted. See Sepulveda, ___ _________ 15 F.3d at 1184. Here, the district court styled the disputed testimony as being "probative . . . of other counts in the case," and denied the motion to strike on that basis. Having scrutinized the testimony in light of the surviving charges against Fitzgerald, we are persuaded that, as Fitzgerald  ____________________ 27The witnesses in question are Veronica Boyden (the mother of James Boyden IV), Marie Boyden-Connors (his sister), and Frances Hannigan (a former owner of Kerrigan's Flower Shop). 57 maintains, it was prejudicial to some degree. But that is not the end of the road. "[A]ll evidence is meant to be prejudicial; it is only unfair prejudice which must be avoided." United ______ ______ States v. Rodriguez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989) ______ _________________ (emphasis in original). Thus, our inquiry must proceed. Fitzgerald cast the motion to strike in "all or nothing" terms. In ruling on it, the district court had to compose a balance between the probative value of the evidence as a whole and the risk of unfair prejudice attendant to keeping it before the jury. See Fed. R. Evid. 403. And though the evidence ___ was prejudicial in a sense, it was also plainly probative of Fitzgerald's role as the kingpin in the organization and bore directly on the remaining charges against him.28 While the question is admittedly close, we are unprepared to say that the evidence's unfairly prejudicial impact substantially outweighed its probative worth. "Only rarely and in extraordinarily compelling circumstances will we, from the vista of a cold appellate record, reverse a district court's on- the-spot judgment concerning the relative weighting of probative  ____________________ 28A few examples may assist in giving texture to this conclusion. Veronica Boyden testified that she heard Lynch, an indicted coconspirator, threaten to call Fitzgerald if James Boyden IV continued to poach on her sales territory. Similarly, Boyden-Connors testified that Fitzgerald himself warned her to keep her brother away from Lynch's territory. Hannigan's testimony, overall, related more to the structure and operating practices of the Fitzgerald-Houlihan organization and less to the slaying of James Boyden IV. By way of illustration, Hannigan testified at length about Fitzgerald's presence at Kerrigan's Flower Shop, his meetings there with other members of the conspiracy, and his daily telephone calls to Doherty from his prison cell during the period of his immurement. 58 value and unfair effect." Freeman v. Package Mach. Co., 865 F.2d _______ _________________ 1331, 1340 (1st Cir. 1988). This is not such an occasion. It follows that the lower court did not misuse its discretion in denying both Fitzgerald's motion to strike and his alternative motion to declare an across-the-board mistrial. F. The Armed Robbery Reference. F. The Armed Robbery Reference. ___________________________ Nardone had also been charged with committing several armed robberies. The district court severed the armed robbery counts before trial. When Nelson (one of Nardone's alleged coconspirators) testified, Houlihan's counsel cross-examined him. In the course of the cross-examination, the lawyer proffered a copy of Nelson's cooperation agreement with the government. No objection appearing, the court admitted the document into evidence. Appended to the cooperation agreement (now a full exhibit) was a copy of the information that the government had filed against Nelson (which contained, inter alia, a count that _____ ____ described an alleged Nelson/Nardone armed robbery). Four days later, Nardone's counsel asked the district court to delete all references to him from the exhibit before it went to the jury. The court refused. Nardone assigns error. We uphold the ruling. There is danger in delay, and the contemporaneous objection rule is, for the most part, strictly enforced in this circuit. See, e.g., United States v. Taylor, 54 F.3d 967, 972 ___ ____ _____________ ______ (1st Cir. 1995); United States v. Griffin, 818 F.2d 97, 99-100 _____________ _______ (1st Cir.), cert. denied, 484 U.S. 844 (1987). While it is true _____ ______ in this case that Nardone's attorney ultimately objected, a 59 belated objection does not cure the original default. To be sure, we might be impelled to intervene if we thought that, despite the lack of a contemporaneous objection, the district court committed plain error by refusing to redact the references to Nardone which appeared in the information. See ___ Olano, 507 U.S. at 732-37 (discussing dimensions of plain error _____ review); see also Fed. R. Crim. P. 52(b). But here, no plain ___ ____ error looms. During cross-examination of Nelson two days after _____ Houlihan's counsel introduced the cooperation agreement into evidence without objection and two days before Nardone's counsel ______ broached the idea of redaction the latter questioned Nelson extensively about the armed robbery and drug conspiracy described in the information. Although these questions were artfully phrased to avoid any explicit reference to Nardone's participation in those crimes, we believe that this harping on the contents of the information bolsters the district court's decision not to excuse the lack of a contemporaneous objection. We conclude, therefore, that the court acted within its discretion in declining to relax the usual rule and in rejecting Nardone's tardy request for redaction.29 G. Jury Instructions. G. Jury Instructions. _________________  ____________________ 29As an aside, we note that there is no inkling of any prejudice stemming from this ruling. For one thing, the jury acquitted Nardone on several counts, so it is impossible to argue convincingly that the unredacted information irretrievably poisoned the jurors against him. For another thing, given the powerful evidentiary strands that tied Nardone tightly to two brutal murders and several other murder attempts, we doubt that the references about which he now complains could conceivably have altered the jury's verdicts. 60 The appellants posit that the district court's charge did not impart the degree of participation required to convict a defendant of conspiracy charges under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. 1961-1969. The RICO statute criminalizes "conduct[ing] or participat[ing], directly or indirectly, in the conduct of [an] enterprise's affairs" through a pattern of racketeering activity. 18 U.S.C.  1962(c). To convey this element of the RICO offenses, Judge Young instructed the jury that the prosecution must prove beyond a reasonable doubt, that by engaging in a pattern of racketeering activity the specific individual accused . . . conducted or participated in the conduct of the enterprise's affairs. The term conduct and participate in the conduct of an enterprise includes the performance of acts, functions or duties which are related to the operation of the enterprise. A person may be found to participate in the conduct of the enterprise even though he has no part in the management or control of the enterprise. The appellants fault this instruction because it told the jury that a defendant could be found guilty even if he did not participate "in the management or control of the enterprise." In their view, the Court's opinion in Reves v. Ernst & Young, 507 _____ _____________ U.S. 170 (1993), signifies the opposite. But this asseveration misconstrues Reves. There, the Court interpreted the words _____ "conduct or participate" as they appear in section 1962(c), and determined that those words require a defendant's participation in either "the operation or management of the enterprise itself." Id. at 185. But because the defendant in Reves was an outside ___ _____ 61 accounting firm that had only a contractual relationship with the allegedly corrupt enterprise it audited the books and issued financial reports, but neither controlled the enterprise nor participated in either its operation or management RICO liability did not attach. See id. at 186. ___ ___ The case at hand is of a distinctively different stripe. Unlike the accountants in Reves, who were classic _____ "outsiders," the appellants here are quintessential "insiders," that is, persons whom the evidence places in the maw of the criminal activity.30 We have previously held that insiders who are integral to carrying out the enterprise's racketeering activities and the appellants clearly fit that description  come within the definitional sweep of section 1962(c). See ___ United States v. Hurley, 63 F.3d 1, 9 (1st Cir. 1995), cert. ______________ ______ _____ denied, 116 S. Ct. 1322 (1996); United States v. Oreto, 37 F.3d ______ _____________ _____ 739, 750-51 (1st Cir. 1994), cert. denied, 115 S. Ct. 1161 _____ ______ (1995). The instructions given in this case are in all material respects identical to those that we approved in Hurley and Oreto. ______ _____ Consequently, we reject this assignment of error without further  ____________________ 30Nardone's claim that he was an independent contractor is imaginative but unconvincing. The evidence supports the view that Nardone was an insider. He maintained regular contact with Fitzgerald and Houlihan throughout the duration of the conspiracy; he obtained his armaments directly from them; and he took orders from them. Indeed, Nardone's description of himself as the organization's "hit man" and "headache man" belies his more recently manufactured "independent contractor" label. 62 elaboration.31 H. Forfeiture. H. Forfeiture. __________ Houlihan contends that the government failed to produce sufficient evidence to support the forfeiture of a house located at 80 Ferncroft Road, Tewksbury, Massachusetts. The government lodged the forfeiture count under 18 U.S.C. 1963(a)32 and the jury found in its favor. The property had been deeded by a third-party seller to Francis Jackson (Houlihan's uncle), and Houlihan's contention is that, because title stood in Jackson's name, the property could not be forfeited in consequence of his (Houlihan's) peccadilloes. "[C]riminal forfeiture is a punishment, not a separate criminal offense." Saccoccia, 58 F.3d at 783. In such a _________  ____________________ 31The appellants also claim that the district court erred by refusing to repeat its concededly correct definition of what constitutes a racketeering "enterprise" in its instructions to the jury on those counts that charged murder and attempted murder in aid of racketeering. Judge Young chose instead to incorporate by reference his correct definition of a RICO enterprise (given to the jury earlier in the charge); and, in the same vein, he specifically informed the jury that, as to all racketeering- related counts, they must find the existence of an enterprise meeting the statutory criteria as an element of each offense. In light of the perfectly sensible course taken by the judge, the appellants' claim is unfounded. A trial court has broad discretion to formulate jury instructions as it sees fit, as long as it touches all the bases. See United States v. DeStefano, 59 ___ _____________ _________ F.3d 1, 4 (1st Cir. 1995). Here, taking the charge as an integrated whole, see, e.g., United States v. Cintolo, 818 F.2d ___ ____ _____________ _______ 980, 1003 (1st Cir. 1987), cert. denied, 484 U.S. 913 (1988), we _____ ______ find no error. 32Insofar as it is germane to Houlihan's situation, the statute provides in substance that a RICO offender shall forfeit to the government any property interest or thing of value acquired with the proceeds of racketeering activity. See 18 ___ U.S.C. 1963(a). 63 proceeding, the government can satisfy its burden of proof by either direct or circumstantial evidence. See id. at 782. In ___ ___ this instance we conclude without serious question that a rational factfinder could determine as this jury did that Houlihan was the de facto owner of the house, and that it had been purchased with proceeds derived from racketeering activity.33 Real estate agents testified that they took Houlihan and his wife, along with Jackson, on tours of the dwelling several times during 1993; that Houlihan told them that he was "interested" in buying it; that Houlihan attended the pre-sale inspection and the two closings that proved to be necessary; and that the property was purchased entirely for cash (approximately $195,000). And, moreover, both Houlihan and his wife were in residence at the premises when the authorities arrested Houlihan in October of 1993. These pieces of evidence combine to form a picture that  ____________________ 33The district court instructed the jury that the government had the burden of proving entitlement to forfeiture beyond a reasonable doubt. The proof here is capable of satisfying that standard. We note, however although we leave the question open that the government may have conceded too much. Compare United _______ ______ States v. Tanner, 61 F.3d 231, 234 (4th Cir. 1995) (holding that ______ ______ criminal forfeiture under 21 U.S.C. 853 requires a preponderance of the evidence, not proof beyond a reasonable doubt), cert. denied, 116 S. Ct. 925 (1996) and United States v. _____ ______ _____________ Elgersma, 971 F.2d 690, 695 (11th Cir. 1992) (en banc) (holding ________ that the preponderance-of-the-evidence standard applies generally in criminal forfeiture cases involving drug proceeds) with United ____ ______ States v. Pelullo, 14 F.3d 881, 906 (3d Cir. 1994) (holding that ______ _______ government, in a criminal forfeiture proceeding under 18 U.S.C.  1963(a), must prove beyond a reasonable doubt that the targeted property was derived from the defendant's racketeering activity). 64 reveals Houlihan as the actual owner of the home in Tewksbury, with Jackson serving merely as a straw. Then, too, the evidence is reinforced by the utter absence of any proof indicating how Jackson might have acquired so large an amount of cash. Given the totality of the circumstances, the jury was entitled to find that the house was forfeitable as a fruit of Houlihan's racketeering. See id. ("Jurors, after all, are not expected to ___ ___ resist common-sense inferences based on the realities of human experience."). I. Sentencing. I. Sentencing. __________ The sentences imposed by the district court are unremarkable in most respects. The sole exception relates to count 20. That count charged Fitzgerald and Houlihan, among others, with conspiracy to distribute a controlled substance (cocaine) in violation of 21 U.S.C. 846. As to Fitzgerald and Houlihan, Judge Young imposed contingent sentences of life imprisonment, to take effect "only if the sentence on count 19 [which charged a continuing criminal enterprise in violation of 18 U.S.C. 848] is reversed [or] otherwise dismissed." Because we affirm the conviction and sentence on count 19, the contingency that Judge Young envisioned has not materialized. Hence, we now vacate Fitzgerald's and Houlihan's convictions and sentences on count 20. We explain briefly. If an indictment charges a defendant with participating in both a conspiracy and a continuing criminal enterprise (CCE), and if the former is used as a predicate act to prove the latter, 65 then the conspiracy is in actuality a lesser-included offense of the CCE charge, and the defendant may not lawfully be sentenced for both crimes. See United States v. Rivera-Martinez, 931 F.2d ___ _____________ _______________ 148, 152-53 (1st Cir.), cert. denied, 502 U.S. 862 (1991); _____ ______ Stratton v. United States, 862 F.2d 7, 9 (1st Cir. 1988) (per ________ _____________ curiam). To do otherwise would result in cumulative punishment violative of the Double Jeopardy Clause. See Jeffers v. United ___ _______ ______ States, 432 U.S. 137, 154-58 (1977) (plurality op.); Rivera- ______ _______ Martinez, 931 F.2d at 152-53. ________ We need not wax longiloquent, for the government, to its credit, concedes the point. Thus, our affirmance of Fitzgerald's and Houlihan's convictions and sentences on count 19 necessitates the vacation of their convictions and sentences on count 20. See Rivera-Martinez, 931 F.2d at 153 (holding that the ___ _______________ Double Jeopardy Clause requires vacation of conviction and sentence on conspiracy count when a defendant is convicted and sentenced on both conspiracy and CCE counts). VI. CONCLUSION VI. CONCLUSION We need go no further. For the reasons we have discussed at length perhaps at too much length we affirm the convictions and sentences of all three appellants in all respects, save only for (a) Houlihan's convictions on counts 5, 6 and 15 (which are reversed), and (b) Fitzgerald's and Houlihan's convictions on count 20 (which are vacated). So Ordered. So Ordered. __________ 66